Here first from Mr. Cliott, Cleet, Cliott. May it please the court. Good morning. Good morning. First of all, I'd like to go through what the issues I'm going to address today. Number one will be the attempt by my client for to withdraw his waiver of attorney or at least some portion of the waiver was was done through his standby counsel. Second would be a couple of constitutional issues regarding a fair trial. One, regarding the failure to sever and also whether or not the defendant had to choose which counts to testify on and which not to testify and also whether or not he should have been required to wear shackles in the courtroom. Maybe, maybe wishful thinking that we'll get past that but I also have number three, the in quotes use of a firearm under 924 C1A and specifically the Cooper case which was from 2020 and has eight factors for the court to consider and whether or I would assume for the jury to consider and whether or not the firearm is used in the furtherance of a drug crime or drug trafficking crime. Fourth would be constructive possession on the date, September 27th, 2017 under the Reyes case and others that are in the brief about knowing possession and then if there's time then I may be able to address possession with intent but start now with what was listed as number eight in my brief but it's the first issue that I would like to mention today and I on your website there were some, some tips that, about what, what we might expect and I want to start with that. One, I think the most critical fact in this case is the fact that Dan Sharp, my client, through his standby counsel addressed the court that at the time when the pre-mark exhibits came out on the day of trial that, that he wasn't going to be able to do this himself and, and his standby counsel, Mr. Leviti Otis said, your honor, he, he, I think he's saying he doesn't want to represent himself and that he wants to withdraw his waiver of his right to counsel. But counsel, it seems to me, we're all familiar with the record more than we are but we've looked at how it was quoted and it seems to me from the briefs you're really putting Judge Davidson in an impossible situation. Isn't it fair to say that the client never asked for the attorney to be re-injected into the case, that the attorney suggested that maybe he should be, but Mr. Sharp never did and he was talking about the documents, but he's made fairly clear at different points and didn't seem explicitly to retract it, that he wanted to represent himself. So tell me where I missed the picture. Yes, and, and, and Judge Southwick, on that issue, I know this court has ruled on two cases, one in 1998, U.S. v. Polanyi and in 2018, U.S. v. Smith and in both of those cases, there was actually a withdrawal of the waiver and the defendant said they wanted to have their attorney take over and the judge denied it and there was not a hearing and there was not a ruling. Your Honor, in this case, our position is that we should always remember that, that these are lay people and when, when Mr. Levitiato has said this to a trial, trial court judge, Your Honor, at that point, what, what I would ask the court to consider adopting is that at that point, it would have been a good time for the court to consider that a waiver because he did, he did have questions on whether or not he would have been able to represent himself and, and for that, at that point, do a hearing on whether or not to elevate stand by counsel to be his counsel would be appropriate because under y'all's ruling in Polanyi and Smith, it would have to cause no undue delay if it could not, if it would not cause a continuance and, Your Honor, at this point, I think we're guessing what, whether or not they would have caused undue delay. Counsel opposite put in his brief that, that the appointed attorney said that Mr. Sharp wanted him to be too rough with the minor children and, Your Honor, he had already filed a motion to withdraw. I think for similar grounds, it was denied and so to say that that meant that he could not go forward on the case, Your Honor, I think, I think without a hearing and without some exploration of whether or not it would cause undue delay, Your Honor, I think that would have been the appropriate time to have that hearing to determine because if the court determined it would cause undue delay, then you just go forward with trial according to the, your, your, the rulings from this district. You just go forward with trial with him representing himself and that issue would be off the board. There wouldn't be any reason to be here arguing that today. All right. Thank you. Now, with regard to and I've gotten through that, that there are a couple of other constitutional issues regarding the right to sever and his appointed counsel filed a motion to sever that was denied and then after that, Mr. Sharp filed a pro se motion for, to sever and it was on a little bit different grounds. He said that he would have to choose whether or not to testify on one ground, one count versus another count and the, there are some, there are some cases on this. They're not anything specifically on point from the Supreme Court or from this district. Now, I did cite a Vanderbilt Law Review article from 2019 that, that shows statistically that there's 10% more, defendants, roughly 10% more likely to be convicted of the most serious charge when he stands trial on multiple counts versus one count. Now, counsel opposite in his brief. Did the government have some reason to believe that Sharp was a big-time drug dealer? No, I did not. I did not work on the trial of this matter. I was only hired for the appeal, but from what I, from what I have seen in the record, Your Honor, these were relatively small amounts, but there were three different days that he was charged with. Spread over months. Ma'am? Spread over several months. That's right. The first one, I believe, was in September of 17, then February of 18, and April of 18, Your Honor. And so, whether or not they, they felt that he was a, I guess a big-time, for lack of a better word, drug dealer, I'm not sure, Your Honor. But, as far as fairness goes, we would just, it's our position that it would have been more of a, it would have been a better opportunity for a fair trial for my client if he would have had the opportunity to, to face these cases one count at a time. One for September, one for February, one for April. Well, one of the arguments made in the district court, I don't think it was made here, is that I think it was the last episode did not involve a gun, yet by charging them all together, the jury heard he was a felon because of the other gun counts, but I don't see that you're pressing that part of it here. You seem, but we do have case law saying that can be problematic. And, Judge Costa, that was, I believe, the motion that was filed by his appointed attorney that was denied. And, Your Honor, I do, I do know that the third count had no gun and the first two did. And, Your Honor, that's one thing that in the next, and that may be a good chance to move to the next point that I have. I believe the third one, that was in April, there was potentially an actual drug deal that happened. I think that was what the detective, Agent Brea, I believe I may be pronouncing that wrong, but he, The one outside the tattoo shop? Yes, sir. Yes, sir. And so he thought he viewed a hand-to-hand transaction and, Your Honor, that one, there was no gun. Correct. There was no gun in that one. And the next step, the next part that I wanted to approach was the fact of whether or not a firearm is used in the commission of a drug trafficking offense. And first of all, back to what you said, as far as severance goes, I think it would have been more fair, a fair trial for my client if he could have had each one hurt separately. And for your, as you pointed out, the third date, the fact that there was no gun involved and there was a gun in the others, it may have made the jury feel like he was more of a threat to society. I'm not saying just because there's a gun involved, but when the gun cases allow the jury to hear he's a convicted felon, which is usually not at all allowed into evidence. It's usually so prejudicial. So that's what our case law says. The problem is if you join a non-gun count with an unrelated felon in possession, the jury is hearing he's a convicted felon. And I think some of it, too, Your Honor, I think some of it, the prior convictions could have come in for the purpose of proving intent. And I think that's what, I think that's what the government used in their case to some extent. And Your Honor, I've got a, I've got something in my notes about that as well. I don't know that we'll get there. But with regard to the firearm being used in a drug trafficking offense, the government included in their brief U.S. versus Cooper, which is a 2020 case. And obviously that's the year after the trial. But when I read the case, I thought, man, that would have been a great jury instruction. That would have really helped the jury to know whether or not the gun was being used in the furthest of a drug trafficking crime because there's eight factors. And one of the number one factor is the type of drug activity. And when we were talking just a moment ago, Judge Acosta, Judge Acosta, about the the April date, that seems like the type of transaction or the type of drug activity if the gun had been there during a possible deal, which is what the drug dealer, I mean, excuse me, the drug agent said, he thought it was a hand-to-hand. To me, that's where you might consider that being a use in furtherance of the drug trafficking crime. And there was no gun there that day. On the other two cases, the September case, he was at what used to be his residence, it was his ex-wife's residence, walks in, they have an argument, there's pill bottles or bottles of some type on the bed. And she ends up, they have an argument and she kills herself. And he tried to commit, he tried to do CPR. That's to do, I don't know if he had any skills with that or not, but he tried to do CPR. So in that case, whether the guns were there or not, that type of drug activity would be more of a possession than a possession with intent. And it also, the firearms would not, in my, our position is that the firearms would not be used in furtherance of the drug trafficking crime because there would be no drug trafficking crime because there was no intent to distribute. Second case, in February, was a traffic stop. Traffic stop where my client, according to the law enforcement officer, swerved over into his lane of traffic. From reading it, it sounded like a DUI stop to me. DUI was not written. But it sounded like a DUI stop to me where a DUI could have been written, possession, charge, charged with possession. Instead, he was charged with possession with intent. Your Honor, it's our position that that is a, that is an overcharging. That's something where the intent was never shown. Now, the state of Mississippi, excuse me, the government used prior convictions. They used text messages from other days, text messages from other times to prove intent. And our position is that, that intent on that particular day was never proven. It was proven by what we would submit to the court is similar to character evidence, meaning that he's just the kind of guy who sells drugs. He's got drugs and that means he's going to sell them because he's done it before. So, Your Honor, we would, we would submit to the court that that's improper. Now, back to the, back to the April, no, the September day, there's been no proof that my client knew what was in those bottles on the bed. Well, there were baggies, scales, and some other kind of paraphernalia in the house. And Your Honor, it was uncontradicted, my client's testimony was uncontradicted that he and his wife were separated at that time. And there was nobody who said that he actually lived in that residence at that time. So, our position is that there was no proof of constructive possession because the narcotics or the alleged narcotics were in bottles on the bed and there was no proof that he knew what was in there. Now, there were scales and there were baggies, Your Honor. I know, Your Honor. You have time for a bottle. I know. Thank you. Thank you. Mr. Lee. May it please the Court. Judge Jones, I want to address your question about did the government have any evidence that the defendant was a big-time drug dealer? And the answer is yes. The jury convicted him of 15 of 16 counts of drug trafficking and gun crimes. And the evidence in this case was overwhelming. We had text messages where the defendant was selling drugs. We had him admitting at one point that he traded firearms for drugs. We had a witness testify that he bought cocaine from the defendant. We had two juvenile witnesses who testified that the defendant and his wife often sold drugs out of the bedroom. The evidence in this case was overwhelming. But what I want to address for the Court, and I imagine the reason we're here, is to talk about the defendant's decision to represent himself. Well, before you leave, what you just said about drug dealing, I wanted the attorney who just argued, talk about constructive possession of what was inside the house. Would you address that? What is in the evidence to tie him to what was inside the house? So, for the September 27th incident, there were text messages that showed that he was dealing drugs right up until that moment. There were actually text messages that showed that he was dealing drugs in the house after the deceased, after his wife was, or she died. There was evidence that Nakia Martin and Betrina Davis testified that Dan Sharp, the defendant, was in the home on September 27th when the officers arrived. He was in the bedroom when the officers arrived. Betrina Davis testified that she went in the bedroom and she saw guns, the semiautomatic firearms, lying on the bed near the drugs. She testified that when she came back, the defendant had moved the semiautomatic firearms to the laundry hamper in the bedroom. So, the defendant actually moved the guns after Monica Sykes passed away. So, the defendant actually handled the guns. We also have photographs of the defendant not long before that holding the firearms that were found in the home and trying to think of anything else. That may be all the evidence for that particular account on September  27th. But, I want to address the defendant's decision to represent himself, which Judge Salfik, you asked about, and the record is clear. The defendant did not ask to withdraw his waiver of his right to counsel. He did not ask Judge Davidson and he did not tell Judge Davidson that he wanted to withdraw his right to counsel. What happened was the government, and by the way, this was after opening argument and after jury selection is when this happened. The jury was recessed and the jury was recessed. The government had handed the defendant a number of government exhibits. He was looking at those exhibits. Those exhibits had already been produced and discovered. He was confused. He said he was confused by those exhibits. He spoke with his counsel. His counsel stood up and said, I believe that the defendant may want to withdraw his waiver of his right to counsel and may want me to represent him. At that point, Judge Davidson asked the defendant, what do you want to do? The defendant did not say, I would like to withdraw my right to counsel. He said . . . Let me ask you about that on the case law. One of the . . . Is it your position that our case law would require something more explicit? It does seem what was going on, and I feel for Judge Davidson, he'd been down this road already a few times as I recall the briefing with this defendant. What should Sharpe have done before Judge Davidson had to do more than he did in this case? When is another hearing necessary? It does seem to me it was in front of him, the judge, that Sharpe representing himself was flummoxed by all the . . . by all these documents that he was seeing, wasn't sure how to proceed. Why isn't that enough? Well, under the case law, both of the defendants in Smith and Polanyi explicitly stated, they clearly stated to the court that they want to stand . . . or counsel to represent them. One of them filed a motion. I get the two cases confused. One of them filed a motion with the court, but both of them stated  explicitly stated that he wanted to stand by counsel to represent him or counsel to represent him. Here, that didn't happen. And if you can appreciate the context here, four days beforehand, we had had a Paretta hearing and the defendant voluntarily waived his right to counsel. And the reason he did that is also clear in the record is he could not get along with his counsel. He could not get along with his . . . He'd gone through two lawyers, hadn't he? That's right. Two lawyers with over 40 years of experience and he refused. There was actually a finding and it's in the record. On page 264, Judge Davidson found well before this point that he was not going to get along with counsel. In fact, there was a clinical psychologist, a psychologist at his competency hearing that found that same point. He would not get along with his counsel. So Judge Davidson was in a difficult position at that point. He said, I can't appoint you another counsel because you are not going to get along with any counsel. So Sharp, the defendant, decided that he knew better than his counsel and he wanted to represent himself. One of the sticking points, and it comes up when he, when Mr. Levitius, Mr. Levitius stands up, is one of the sticking points is that Dan Sharp was adamant that he wanted to cross-examine the two earlier who saw him in the bedroom on September 27th. He wanted to cross-examine those witnesses and Mr. Levitius was not going to do it. And he said that to the court when he stood up. He said, I believe my client may want to withdraw his right to counsel. However, I'm not going to cross-examine these juvenile witnesses about their mental history, which is what he wanted to do. And that's on page 801 of the record. Mr. Levitius says, it's such a fragile thing and I, as his lawyer, I, as his lawyer, am not going to do it. And after he said that, the defendant did not state, I still want Mr. Levitius to represent me. He did not state that. That was a, that was a sticking point for the defendant. Instead, the defendant proceeded to go on the trial and represent himself and that same day, he did exactly what he said he was going to do, the defendant. He cross-examined those juvenile witnesses and it played out just like Mr. Levitius said it was going to play out. It did not go well, but he was going to do that because he thought he knew better than his counsel. As far as the severance. Counsel, I want to ask about the confrontation clause, confrontation claim against Detective Brey's testimony. And it seems like I'm getting a couple cases a year where the government's backdooring hearsay in through this, you know, understanding the investigation. We have a number of cases the last few years saying that is a violation. It's almost like, you know, you can say, well, how did you start your, how did your murder investigation begin to focus on this defendant? And you say, oh, well, an eyewitness told us he was the shooter. And I guess I'm wondering why that keeps happening and whether you think it was permissible here. Well, Your Honor, I mean, candidly, I asked the question. I wish I would have asked it a little differently. So candidly, if I had to do it over again, I would ask the question differently. But the intention very much was to get Detective Brey to talk about what happened. The government did not need that evidence and did not rely on that as evidence as a reason why the defendant was selling drugs on April 19th. We didn't reference it again and say this is why you should find him guilty. The evidence on that count was the fact that we had a live witness testify, I bought drugs from the defendant on that occasion. I bought cocaine. So I would submit that it was not hearsay because it was not offered to show that Dan Sharp, the defendant, sold meth on that day. However, I would agree with the court that it could have been asked in a better way. I would submit that . . . And the problem is two purposes, right? And our case law says if the possibility is going to be used for the purpose of showing how they came to focus on the defendant. That's right. The case law cuts both ways here, Your Honor, but I would say that, you know, out of abundance of caution, I would have done it a different way if I had it to do over again. But I would also submit that that was not . . . We were not trying to backdoor evidence and try to get evidence in. And we didn't need to. I mean, we had the evidence.   So I would submit that it was not intended for that purpose. The case law, where it is a violation of the Confrontation Clause, the government actually needs that evidence to get a conviction. But here, we didn't need the evidence. And it was, you know, I would submit that even if there was an error, it was certainly harmless in light of the overwhelming evidence that he was selling drugs on that particular occasion. Mr. Levy, was that the only mention of that? Or did that get restated either in closing argument or in some other way that the witness had said that? Well, the defendant actually seized on that point. I don't know if that's what the court is referring to. But the defendant was sort of locked in on the CI. And he cross-examined Agent Gray for, it felt like, ten minutes on that particular point. So while we may have started our narrative that way, we anticipated anyway, and the defendant did, get into that. And he wanted to get into that. He wanted to talk about, he wanted to talk about that particular incident. So I would say that even if there was some error also, the defendant waived any sort of argument that the government, you know, informationally used that evidence. Well, did the government refer to that, particularly after it was highlighted, refer to it itself again, such as in closing argument? Not in closing argument, Your Honor. I do not believe in closing argument. Now, I believe I mentioned it in the opening in the same sort of narrative form, but not in closing argument that I'm aware of. And I did look for that, but I did not see it. Regarding the motion to sever, there were three issues that the defendant raised. Two of them were raised by his counsel. One was that the government was sort of piling on the halo effect of having three separate incidents in one trial. And the court addressed that and then gave a multi-count, single-defendant jury instruction, which this court says juries are perceived, or juries are presumed, excuse me, to follow. And the jury did do that. The jury actually looked at each individual count because the jury found the defendant not guilty on one of the counts for the April 19th drug trafficking counts. The other issue the defendant raised with his attorney was the felon in possession count and the fact that on April 19th there were no guns, and so if it was severed, there would have been no mention of the felon in possession count. I believe, and I was looking for it in the record, I'm not sure if I addressed this on appeal because the defendant didn't really focus on it on appeal, but I believe the district court gave an instruction to deal with that. I know that the court said it was going to give an instruction to deal with that. And then the final one about his testimony, the defendant raised that at his Faretto hearing four days before trial. And what Judge Davidson did is he said, I understand you and I understand that you may or may not want to testify. Raise the issue at trial when that time comes and I will address what the government can talk about and I will give any appropriate jury instruction. And the defendant never raised that issue at trial. He never got back into it. He just decided to testify and testify. The government was limited on cross to only things that the defendant testified naturally. But Judge Davidson did address that particular point. And then finally, as far as the shackles go, one thing that I want to communicate to the court is just how hostile and volatile the defendant was throughout these proceedings. The defendant did not get along with his first attorney, so much so that his first attorney was forced to withdraw. And then within a week of meeting with his second attorney, he threatened to choke his attorney out. And his attorney filed, this is in page 198 of the record, his attorney filed a pleading entitled Counsel's Notice to the Court with Respect to Conduct of Trial in Client's Mental Status. And the attorney stated not only that he threatened to choke me out, but that other counsel who had represented the defendant were afraid of him. So when the defendant decided to represent himself four days before trial, Judge Davidson had to determine how the defendant could actually try the case without posing a threat to the courtroom. And he immediately, as soon as he said that the defendant could represent himself, turned his attention to courtroom security because we were four days away from trial. And he told the defendant, I'm going to let your hands stay free, but I'm going to put leg shackles on you and we're going to pad them, and that way you can move about the court quietly. But Judge Davidson had no choice but to impose some security measures here based on his threats to his attorney, who was sitting three feet from the defendant during the whole trial, his standby attorney. And the defendant was cross-examining witnesses, these two girls, and he was closer than me to Judge Jones to these two girls. There were firearms, they had been rendered safe, but big metal pieces, big metal weapons, six feet from where the defendant was standing, maybe ten feet from where the defendant was standing. And the defendant had a battery to a juror conviction, and the defendant was standing ten yards from the jury. I assume the judge gave an instruction about that. Yes, yes, Your Honor. The judge did give an instruction. He was walking around or whatever you do in shackles. I mean, these shackles weren't hidden and he was sitting at the table? That's right. When he was sitting at counsel table, you know how the tables are, they have skirts around them, so you can't see them when you're sitting. But when you get up to move, the jury was able to see him. He would stand up and walk around our table and walk to the podium. He wasn't permitted to go anywhere except for his table to the podium. There was actually duct tape on the floor that showed him where to go. And the government actually had to abide by the same rules as the defendant. We weren't allowed to approach the guns. The defendant wasn't allowed to approach the guns. But the jury could see those black padded shackles. The jury could see them. But he moved about the courtroom pretty well. But I would submit that the court had no choice but to shackle the defendant based on his behavior and his past criminal history. I see that I have three minutes remaining, but the government is prepared to cede its time unless the court has any more questions. Thank you. I don't think we have any. Thanks for the time, ma'am. Thank you. Mr. Cliatt? You haven't been fired yet, right? Ma'am? You have not been fired by Mr. Sharp. I'm sorry. I say you have not been fired by Mr. Sharp. Not yet. Are you the first appellate counsel? I'll say this, Your Honor. We have, due to COVID-19, we had very little face-to-face interaction at the Oxford Lafayette County Jail there in Mississippi. We had to talk on the telephones, and we were on opposite sides of glass. But no, I've not had any negative communication with him, no, Your Honor. When did you come into the case? Sir? When did you come into the case? Right after, Judge, right after sentencing, or when did you come into the case? I was first contacted about the case about a week before sentencing. Okay. And then, once he was sentenced, within a week or two is when I was retained. His sister hired me. With regard to rebuttal, earlier on my opening argument, I mentioned on the September 27, 2017 day that there was no proof that my client knew what was in the bottles on the bed. In response, counsel opposite said, well, one of the children said there were guns on the bed and that my client moved the guns. Still, no mention that my client knew what was in the bottles. So with regard to the charges stemming from September 27, 2017, our position is that there was no proof of constructive possession. In the Reyes case, and there are some others that were mentioned in my brief, the proof has to be that my client knowingly possessed the narcotics with the intent to distribute. If there's no proof that he knew what was in those bottles, our position is that he should not have been convicted on those charges due to the fact that he didn't knowingly possess them. Second of all, it was uncontradicted in the testimony that he was separated from his wife. Nobody testified. None of the children didn't testify on anything different from that. So that testimony was uncontradicted. Now, with regard to his right to counsel, I think the thing that we all have to remember is that this is a layperson. And it's not just a regular old layperson. This is a layperson that there was a mental evaluation done. And there was a mental evaluation done. And then Mr. Leviti Otis, as it was mentioned just a moment ago, he filed something with the court talking about my client's mental condition and whether or not it would be safe in the courtroom. For us to say he has a conversation with Mr. Leviti Otis, Mr. Leviti Otis says to the court that my client is not sure or something to that effect that he can represent himself. I've got it here. And I've quoted it from the record saying that he wished, my client being he, he wished to have a lawyer after all and to withdraw his waiver of attorney. Given the special circumstances, at that point, what we're asking the court to do is to rule that there should have been a hearing at that point, whether or not to elevate standby counsel, and whether or not it was even possible. If there was going to be undue delay or if there was going to be a continuance according to these two cases from this honorable court, Palani and Smith, then it would have been a very short hearing and it would have been on the record and all of these questions would have been answered. So that's what we're asking the court to do on that issue. With regard to the sever, the client representing himself caused a myriad of issues in appeal because he didn't object to numerous things. He didn't object or he didn't raise, as counsel opposite said, he didn't raise the issue to the court when he came to testify about which ones he wanted to testify when he did want to. Well, a guy who represents himself has a fool for a lawyer. So I don't think that really enhances the severance argument. I understand, Your Honor. And in our position under the Constitution that he has a right to a fair trial and in some ways the fact that he was representing himself and he failed to object to the shackles, he failed to object to the shackles, he failed to object to the confrontation clause issue, all of that makes it plain error. Plain error is the most difficult to overturn. However, it is a substantial right. It's a substantial right that we're talking about. It's a constitutional right to a fair trial. Well, I think you've done a very reasonable job representing your client. The red light is on. Yes, Your Honor. And we have all this well briefed. Thank you. So thank you. Thank you. Yes, sir.